*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

—————————

## UNITED STATES
Appellee

**v.**

## Mario I. LOPEZ, Sergeant
United States Army, Appellant

### No. 16-0487
Crim. App. No. 20140973

Argued January 10, 2017—March 20, 2017

Military Judges: Wade N. Faulkner and Kenneth W. Shahan

For Appellant: *Captain Timothy G. Burroughs* (argued); *Colonel Mary J. Bradley*, *Lieutenant Colonel Melissa R. Covolesky*, and *Major Christopher D. Coleman* (on brief); *Captain Jennifer K. Beerman.*

For Appellee: *Captain Jennifer A. Donahue* (argued); *Colonel Mark H. Sydenham, Lieutenant Colonel A. G. Courie III*, and *Major Melissa Dasgupta Smith* (on brief).

Judge STUCKY delivered the opinion of the Court, in which Chief Judge ERDMANN, and Judges RYAN and OHLSON joined. Judge SPARKS filed a separate opinion concurring in part and dissenting in part.

—————————

Judge STUCKY delivered the opinion of the Court.

Appellant is challenging his convictions for indecent liberties with a child and rape, arguing that each conviction was prejudiced by a different inadmissible statement from a Government witness. We hold that Appellant cannot establish material prejudice with respect to his conviction for rape, but that his indecent liberties conviction was prejudiced by improper testimony. We therefore reverse only Appellant's conviction for indecent liberties with a child, setting aside the sentence and returning the record to the Judge Advocate General of the Army with authorization for a rehearing.

## I. Procedural History

At a general court-martial with an officer panel, Sergeant (SGT) Mario I. Lopez was convicted, contrary to his

pleas, of indecent liberties with a child, and rape, in viola-
tion of Article 120, Uniform Code of Military Justice
(UCMJ), 10 U.S.C. § 920 (2007). He was acquitted of aggra-
vated sexual assault and forcible sodomy. The panel ad-
judged and the convening authority approved the following
sentence: a dishonorable discharge, confinement for five
years, forfeiture of all pay and allowances, and reduction to
the lowest enlisted grade. The United States Army Court of
Criminal Appeals (CCA) summarily affirmed the findings
and sentence. *United States v. Lopez*, No. 20140973 (A. Ct.
Crim. App. Apr. 5, 2016).

## II. Discussion

Because Appellant is challenging two distinct convic-
tions, we will discuss the facts and arguments for each speci-
fication separately.

### A. The Rape Specification

1. Facts

For the rape specification, the Government put on four
central witnesses: the victim (Appellant's wife CL), CL's
children (NM and JDM), and the doctor who conducted the
sexual assault examination.

CL testified that she married Appellant in 2001. But in
July 2010, she informed SGT Lopez that, due to ongoing
marital issues, she would no longer engage in sexual rela-
tions with him. This stance continued for months.

On the day of the assault, April 17, 2011, Appellant told
CL that if she "didn't perform sexually for him, he would
have to stop treating [her] like a lady." That night in bed,
SGT Lopez "started pulling [CL] close to him, not gently, but
strongly." CL "reminded him . . . that he knows . . . what's
happening between us, that you know . . . we're not doing
this," but "he wasn't listening" and began touching CL's vag-
inal area and breasts.[1] After an interlude in which CL re-
treated to the bathroom to "to try to collect [herself]" and
then returned, Appellant resumed his advances, followed CL

---

[1] CL testified that Appellant's finger penetrated her vagina,
but the panel acquitted Appellant of the specification alleging this
conduct.

out of the bed, and pushed her upper body back onto it, holding her down face-first. Despite CL's repeated attempts to escape, Appellant then had sex with her vaginally.[2]

The next day, CL performed "a Google search on the computer about spousal rape." She reported the rape to Chaplain Dillard, and then to a victim advocate, before undergoing a medical examination performed by Major Williams. It was stipulated that Appellant's DNA was found inside of CL. Major Williams recounted that CL told him a substantially identical version of her in-court testimony, and described her demeanor as "teary eyed, as if she was in shock, and just teary eyed . . . a flat effect face." Major Williams observed red marks that looked like finger marks on CL's right shoulder, a scratch on her left upper back, a scratch on her right lower back, and bruising on her inner thigh.

JDM, CL's son and Appellant's stepson, testified that the night of April 17, 2011, stood out in his mind. He heard "crying and moaning" coming from his mother's room, and stated that the noises "were sad noises."

NM, CL's daughter and Appellant's stepdaughter, testified that she walked past the bedroom and heard CL say "get off me." On the day after the assault, as NM was using CL's computer, she discovered CL's Internet search history. She testified:

> my brother was on the computer, and he asked me if my mom had ever—had asked me whether I heard anything last night, and so we were wondering why she had asked him that, and I got on the computer. I was watching my shows, and I deleted my history, because I know my mom doesn't like me watching shows on her computer, so I saw when I was deleting my history that she had been looking up spousal rape sites, like how to deal with it, who to go to, and so I gathered that Mario [Appellant] had probably raped her by the evidence that I found that day.

---

[2] CL also claimed that Appellant's penis "slightly" penetrated her anus, but the panel acquitted Appellant of this specification as well.

NM explained that she "just kind of put two and two together" even before CL told her, later in the day, what had "really happened." Appellant did not object to any of this testimony.

2. Analysis

Appellant argues that NM's statement "I gathered that [Appellant] had probably raped her" was erroneously admitted because it was human lie detector testimony, impermissible lay witness opinion, and an opinion regarding the ultimate issue of guilt or innocence. However, we need not reach these questions. Appellant never objected to this testimony, and when "an appellant has forfeited a right by failing to raise it at trial, we review for plain error." *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009). Appellant thus "has the burden of establishing (1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014); *see also United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004) ("the burden of establishing entitlement to relief for plain error is on the defendant claiming it"). "[F]ailure to establish any one of the prongs is fatal to a plain error claim." *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006). Here, Appellant cannot establish material prejudice.

In this context, material prejudice to the substantial rights of the accused occurs when an error creates "an unfair prejudicial impact on the [court members'] deliberations." *Knapp*, 73 M.J. at 37 (alteration in original) (internal quotation marks omitted) (citation omitted). In other words, the appellant "must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (internal quotation marks omitted) (citation omitted).

The Government had a very strong case, including (a) CL's direct testimony to the event, (b) physical evidence, including marks of struggle on CL's right shoulder, back, and inner thigh, and Appellant's DNA inside of CL, (c) Appellant's two stepchildren testifying to "sad noises" and "get off me" coming from the bedroom, (d) CL's immediate reporting

of the assault to a chaplain, a victim advocate, and a medical examiner, and (e) CL's searches for "spousal rape" on the Internet the next day. All of this evidence was properly admitted for the panel's consideration. The defense case was relatively weak, as defense counsel conceded that sex had occurred, but argued that CL had fabricated the rape allegation and that the evidence supporting it did not stack up. In view of the Government's overwhelming evidence, NM's testimony that Appellant "probably raped" CL touched on an obviously material question, but was of only passing significance. Ultimately, we conclude that Appellant has failed to establish that the challenged testimony had "'an unfair prejudicial impact on . . . deliberations.'" *Knapp*, 73 M.J. at 37 (quoting *United States v. Powell*, 49 M.J. 460, 463 (C.A.A.F. 1998)). Appellant thus fails to establish material prejudice.

### B. The Indecent Liberties with a Child Specification

### 1. Facts

The evidence supporting Appellant's second conviction consisted entirely of the testimony of two witnesses. CL's minor son JM[3] testified that when he lived with CL and Appellant in Korea, Appellant introduced him to pornography, and he and Appellant would watch it together "maybe at most once a week, maybe twice a month, three times a month . . . [m]aybe forty or fifty, maybe at most sixty times over the course I lived with [Appellant]." JM testified that the pornography included vaginal, oral, and anal sex, and the number of participants would vary from two or three up to "about six girls, three guys." He explained that "[Appellant] said not to tell my mom or my brother or sister, because it was a thing between me and him."

CL testified that she discovered JM looking at pornography on her computer. When she heard JM's explanation that Appellant had introduced him to pornography, she decided to confront Appellant over the phone "to find out what was going on." The challenged testimony then followed, as CL recounted JM's confrontation with Appellant:

---

[3] JM should not be confused with JDM, an older son who testified on the rape specification about hearing "sad noises."

[CL]: …[I]t took several minutes of [JM] insisting, recounting events of what had happened and saying you remember you did this with me, and so finally Sergeant Lopez started calming down and acting like he was going towards admission.

Q: What does that mean to you, acting?

[CL]: Well, in the sense where it kind of ended with him saying [JM] if I did anything wrong, then I—you know, I apologize, and I knew from living with him, instead of coming out and saying yes, I did this and I was wrong—

DC: Objection.

MJ: Basis?

DC: Human lie detector testimony.

MJ: I'm going to overrule the objection based on the witness's interactions with the accused as husband and wife.

….

Q: And to you after ten years of marriage, what did that mean?

[CL]: That meant that he was loosely admitting guilt without coming out and saying it, because he said things like that to me before.

Q: The accused had said things like that to you before?

[CL]: Yes, so I knew what that meant, and that was the thing I needed to know, because I really was trying to feel out who was telling the truth here. I wanted to get to the bottom of it and resolve this with my son.

2. Analysis

Because Appellant preserved this error with a timely objection, we review the military judge's admission of this evidence not for plain error, but for abuse of discretion. *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007). We conclude that CL's testimony constituted human lie detector testimony, and accept the Government's concession that it was also inappropriate lay opinion testimony.

Human lie detector testimony is "an opinion as to whether [a] person was truthful in making a specific statement re-

garding a fact at issue in the case." *Knapp*, 73 M.J. at 36 (internal quotation marks omitted) (quoting *Brooks*, 64 M.J. at 328). Even without an express statement to this effect, testimony may still be excluded as the functional equivalent of human lie detector testimony where "the substance of the testimony leads the members to infer that the witness believes the victim is truthful or deceitful with respect to an issue at trial." *United States v. Martin*, 75 M.J. 321, 324 (C.A.A.F. 2016); *accord Brooks*, 64 M.J. at 329 ("the expert should not be permitted to give testimony that is the functional equivalent of saying that the victim in a given case is truthful or should be believed").

In isolation, CL's statement that Appellant was "loosely admitting guilt without coming out and saying it," might present a difficult question under our human lie detector jurisprudence, because the sentence does not explicitly address the truth or falsity of Appellant's alleged confession. But CL's next sentence removed all doubt: "so I knew what that meant, and that was the thing I needed to know, because I really was trying to feel out *who was telling the truth here*." (Emphasis added.)

By explaining her truth-seeking aim in interpreting Appellant's apology as an admission, CL in effect testified that JM was "telling the truth here," and that Appellant was truthful in "loosely admitting guilt" but not in denying JM's allegations. Her opinion bolstered JM's credibility, and questioned Appellant's claims of innocence. This violates the core prohibition on human lie detector testimony. *See Knapp*, 73 M.J. at 36. Such testimony "is inadmissible at a court-martial . . . because it is a 'fundamental premise of our criminal trial system [that] 'the [panel] is the lie detector' and '[d]etermin[es] the weight and credibility of witness testimony.'" *Martin*, 75 M.J. at 325 (alterations in original) (citations omitted). We conclude that the military judge abused his discretion in admitting this evidence.

Furthermore, we accept the Government's concession that CL's testimony fails to satisfy the standards for admission of a lay opinion. Lay opinion testimony is only admissible if (1) the opinion is rationally based on the witness's perception; and (2) the opinion is "'helpful either to an understanding of the testimony of the witness on the stand

or to the determination of a fact in issue.'" *United States v. Byrd*, 60 M.J. 4, 7 (C.A.A.F. 2004) (quoting *United States v. Cox*, 633 F.2d 871, 875 (9th Cir. 1980)). When "facially coherent communications" are at issue, no lay interpretation will be helpful or admissible, unless the proponent "'establish[es] a foundation that call[s] into question the apparent coherence of the conversation so that it no longer seem[s] clear, coherent, or legitimate.'" *Id.* (quoting *United States v. Garcia*, 291 F.3d 127, 142 (2d Cir. 2002)). The Government now concedes that Appellant's statement—"if I did anything wrong, then I—you know, I apologize"—was a facially coherent communication.

"Having determined that the military judge abused his discretion, we must now determine whether this error resulted in material prejudice to Appellant's substantial rights." *United States v. Barnett*, 63 M.J. 388, 397 (C.A.A.F. 2006) (citing Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2000)). "We evaluate prejudice from an erroneous evidentiary ruling by weighing (1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999).

If CL's inadmissible interpretation is removed, the Government's case wholly consisted of (1) JM's testimony and (2) the admissible portion of CL's testimony, which recounted Appellant denying JM's claims and apologizing "if [he] did anything wrong." Although the defense case merely cast doubt on JM's account,[4] it is the explosive nature of the error itself that ultimately decides the question. In the panel's mind, CL's inadmissible testimony may well have transformed Appellant's noncommittal apology into a material admission and a validation of JM's story, as interpreted by JM's mother, Appellant's wife of ten years. Given the highly persuasive effect that this type of lie detector testimony

---

[4] The defense case largely consisted of defense counsel asking the panel whether it was "reasonable" to think that Appellant could "spend over a hundred hours . . . watching porn with his stepson and no one notices."

would likely have on a panel, we cannot conclude that the error was harmless.

## C. Conclusion

Appellant's conviction for indecent liberties with a child was prejudiced by CL's inadmissible testimony, but his conviction for rape was not so prejudiced.

## III. Judgment

The judgment of the United States Army Court of Criminal Appeals is reversed with respect to Specification 3 of Charge I, and the sentence. The findings of guilty as to that offense and the sentence are set aside. The judgment is affirmed as to the approved findings of guilty for Specification 1 of Charge I. The record is returned to the Judge Advocate General of the Army, and a rehearing is authorized.

Judge SPARKS, concurring in part and dissenting in part.

I agree with the majority that NM's testimony was not prejudicial for the reasons cited. I also agree that CL's testimony qualified as improper lay opinion and arguably impermissible human lie detector testimony. However, I part with the majority as to whether CL's improper testimony materially prejudiced Appellant's substantial rights.

As stated by the majority, prejudice resulting from an erroneous evidentiary ruling is determined by weighing the *Kerr* factors: "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999). Here, I conclude that this erroneously admitted evidence lacked any real quality, that the Government's case was strong enough, and the defense case was less so. CL testified that Appellant stated, while on the phone with herself and JM, that "if I did anything wrong, then … you know, I apologize." To my mind, this is essentially an admission of guilt that certainly required no further interpretation by CL. My reading of the statement is that Appellant was not leaving open the question whether he had watched pornography with his minor stepson or not, but rather leaving open for question whether or not engaging in this conduct with his minor stepson was wrong. In other words, Appellant was essentially saying, "If what we were doing can be considered wrong, then I apologize." Thus, the members were likely to reach the conclusion that Appellant was admitting to having watched pornography with JM, regardless of what CL might have added through her testimony.

In addition, the Government's case on these charges was strong. JM's testimony about the numerous times he and Appellant watched pornography together was full of the sort of specific detail that could credibly lead the members to convict. Finally, on this record I cannot conclude the members found convincing defense counsel's insinuation that JM invented the story of watching pornography with his stepfather and stuck with that story throughout the trial simply in order to deflect his mother's anger. Therefore, given the strength of the Government's case and what little CL's testimony added, CL's improperly admitted testimony could not have prejudiced Appellant's case. Accordingly, I respectfully concur in part and dissent in part.